## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION AT KNOXVILLE

| | |
|---|---|
| JONATHAN RAUL, Individually and on Behalf of All Others Similarly Situated,<br><br>                 Plaintiff,<br><br>    v.<br><br>RUBY TUESDAY, INC.,<br>STEPHEN I. SADOVE,<br>JAMES F. HYATT, II,<br>F. LANE CARDWELL, JR.,<br>MARK W. ADDICKS,<br>KEVIN T. CLAYTON,<br>DONALD E. HESS,<br>BERNARD LANIGAN, JR.,<br>JEFFREY J. O'NEILL,<br>RTI HOLDING COMPANY, LLC,<br>RTI MERGER SUB, LLC,<br>NRD PARTNERS II, L.P.,<br><br>                 Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jonathan Raul ("Plaintiff") by and through his undersigned attorneys, brings this class action on behalf of himself and all others similarly situated, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Ruby Tuesday's website concerning the

Company's public statements; and (d) review of other publicly available information concerning Ruby Tuesday and the Defendants.

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Ruby Tuesday against the Company and the members of the Company's board of directors (the "Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Ruby Tuesday to affiliates of NRD Partners II, L.P. ("NRD") (the "Proposed Merger").

2.     On October 16, 2017, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with RTI Holding Company, LLC ("Parent"), a fund managed by NRD, and RTI Merger Sub, LLC ("Merger Sub"), a wholly owned subsidiary of Parent.  Pursuant to the Merger Agreement, Merger Sub will merge with and into Ruby Tuesday, after which Merger Sub will cease to exist, and Ruby Tuesday will survive as a wholly owned subsidiary of Parent, a fund managed by NRD.  In connection with the Proposed Merger, each share of Ruby Tuesday common stock issued and outstanding will have the right to receive $2.40 in cash, in a transaction valued at approximately $146.3 million.  Further, NRD will assume or retire all debt obligations for a total enterprise value of approximately $335 million.

3.     The consummation of the Proposed Merger is subject to certain closing conditions, including the approval of the stockholders of Ruby Tuesday.  The Company expects the Proposed Merger to close in the first calendar quarter of 2018.

4.     On October 31, 2017, in order to convince Ruby Tuesday shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and

misleading proxy statement filed on Form PREM 14A (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.    While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the Proxy, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

6.    In particular, the Proxy is materially false and misleading and/or omits material information concerning, *inter alia*, the following: (i) the terms and details surrounding any alternative indications of interest the Company solicited or received from other companies; (ii) the financial projections for Ruby Tuesday; and (iii) the financial analyses performed by the Company's financial advisor, UBS Securities LLC ("UBS"), in support of its fairness opinion.

7.    It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.

8.    Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Ruby Tuesday stockholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) Ruby Tuesday's principal executive offices are located in this District at 333 East Broadway Avenue, Maryville, Tennessee 37804; (iii) each of the Individual Defendants, and Company officers and/or directors, either resides in this District or has extensive contacts within this District; (iv) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (v) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (vi) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12. Plaintiff is, and at all relevant times has been, a Ruby Tuesday stockholder.

13. Defendant Ruby Tuesday is a Georgia corporation with its principal executive offices located at 333 East Broadway Avenue, Maryville, Tennessee 37804. Ruby Tuesday's common stock is listed on the New York Stock Exchange under the ticker symbol "RT."

4

14.     Defendant Stephen I. Sadove ("Sadove") has been a director of the Company since 2002 and is the Non-Executive Chairman of the Board.

15.     Defendant James F. Hyatt, II ("Hyatt") has been the President, Chief Executive Officer ("CEO") and a director of the Company since April 2017.

16.     Defendant F. Lane Cardwell, Jr., ("Cardwell") has been a director of the Company since 2012.  Defendant Cardwell was the interim President and CEO of the Company from September 2016 to April 2017.

17.     Defendant Mark W. Addicks ("Addicks") has been a director of the Company since 2014.

18.     Defendant Kevin T. Clayton ("Clayton") has been a director of the Company since 2006.

19.     Defendant Donald E. Hess ("Hess") has been a director of the Company since 2014.

20.     Defendant Bernard Lanigan, Jr., ("Lanigan") has been a director of the Company since 2001.

21.     Defendant Jeffrey J. O'Neill ("O'Neill") has been a director of the Company since 2012.

22.     Defendants Sadove, Hyatt, Cardwell, Addicks, Clayton, Hess, Lanigan and O'Neill are collectively referred to herein as the "Individual Defendants."

23.     Defendant RTI Holding Company, LLC ("Parent") is a Delaware limited liability company and fund managed by NRD Capital that was formed for the purpose of the Proposed Merger. Parent is an affiliate of NRD.

24.     Defendant RTI Merger Sub, LLC ("Merger Sub") is a wholly owned subsidiary of

Parent formed for the purpose of the Proposed Merger. Merger Sub is an affiliate of NRD.

25. Defendant NRD Partners II, L.P. ("NRD") is a private equity fund founded in August 2016 and is the parent of Parent.

26. The Individual Defendants, Parent, Merger Sub and NRD are collectively referred to as the "Defendants."

## CLASS ACTION ALLEGATOINS

27. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Ruby Tuesday (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of October 24, 2017 (based on information provided in the Proxy), there were approximately 61,186,581 shares of Ruby Tuesday common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Ruby Tuesday will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i. whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

    ii. whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii. whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29. Ruby Tuesday owns, operates, and franchises the Ruby Tuesday casual dining restaurant chain and operates in the bar and grill segment of the casual dining industry. As of September 5, 2017, there were 599 Ruby Tuesday restaurants in 41 states and 14 foreign countries. Ruby Tuesday-owned and operated restaurants are concentrated primarily in the

Southeast, Northeast, Mid-Atlantic and Midwest of the United States.

## The Flawed Process Leading to the Merger Agreement

30.     On August 11, 2016, the Company announced that it planned to close approximately 95 of its underperforming restaurants as part of an asset rationalization plan following an extensive, cross-functional review led by the Company's Chief Development Officer in consultation with the Board and executive management. The Company called the asset rationalization plan the "Fresh Start Initiative," which was intended to "streamline the organization, improve financial profitability, and create long-term value for shareholders."

31.     On September 13, 2016, the Company announced the resignation of James J. Buettgen ("Buettgen"), President and CEO at the time and the appointment of defendant Lane Cardwell, Jr. ("Cardwell") to act as the interim President and CEO.

32.     On September 23, 2016, NRD sent the Board an unsolicited letter of intent for a potential acquisition of Ruby Tuesday at a price of *$3.50 per share*. Ruby Tuesday shared the letter with UBS Securities LLC ("UBS"), which had previously provided advice to Ruby Tuesday on an informal basis without a fee arrangement, in connection with the sale of Ruby Tuesday-owned Lime Fresh Mexican Grill restaurants on June 1, 2016. The Board determined the $3.50 per share price offer was not in the best interests of the Company, instead focusing on implementing the Fresh Start Initiative.

33.     On October 11, 2016, defendant Cardwell met with Aziz Hashim, the founder and Managing Partner of NRD.

34.     On January 4, 2017, UBS discussed with the Board the preliminary analysis of Ruby Tuesday's valuation based on management financial projections dated November 11, 2016.

35.     On January 11, 2017, NRD sent a follow-up letter to Ruby Tuesday reiterating its

*offer of $3.50 per share*. In response, on the same day, Ruby Tuesday contacted and officially retained UBS as a financial advisor to explore strategic alternatives.

36.     On January 14, 2017, the Board met and based on the investor conference call following its previous earnings release, that Fresh Start Initiative was not sufficient and an alternative plan was needed. The Board discussed the proposal from NRD and set a meeting to discuss with UBS and Davis Polk & Wardwell LLP ("Davis Polk"), the Company's counsel.

37.     On January 18, 2017, UBS communicated to NRD that Ruby Tuesday would allow NRD to conduct limited due diligence on the Company for a 30-day period, without exclusivity, with the understanding that NRD would improve its offer price and address Ruby Tuesday's concern over financing arrangements.

38.     On January 19, 2017, NRD provided a letter to Ruby Tuesday outlining NRD's access to equity; subsequently, the Company and NRD entered into a confidentiality agreement dated January 25, 2017 which contained a standstill provision and provided NRD certain non-public due diligence information.

39.     Over the 30-day due diligence period, Ruby Tuesday entered into confidentiality agreements with a series of NRD's prospective financing sources and made a limited-scope data room available to NRD and its financing sources. NRD requested that Ruby Tuesday enter into a confidentiality agreement with a third-party franchise operator potentially interested in acquiring a number of Ruby Tuesday's restaurant locations, but Ruby Tuesday decided that it was premature for NRD to bring in additional parties until NRD submitted an improved offer.

40.     On February 27, 2017, NRD submitted revised, reduced offer for the acquisition of the Company in the price range of $2.50 to $3.00 per share.

41.     On March 3, 2017, the Board decided to make a public announcement scheduled

9

for March 6, 2017 that it would review strategic alternatives, including a sale of the Company.

42. On March 5, 2017, NRD's financial advisor, Arlington Capital Advisors ("Arlington"), requested that Ruby Tuesday delay the strategic alternatives press release to give NRD time to submit a preemptive offer, which Ruby Tuesday agreed to.

43. On March 9, 2017, NRD submitted a *revised offer of $2.51 per share* and represented it obtained signed letters of intent from institutions totaling $280 million in financing, in addition to equity commitments of $95 million form its affiliated equity funds.

44. On March 10, 2017, the Board met and determined the $2.51 per share price was insufficient.

45. On March 13, 2017, Ruby Tuesday issued a press release indicating it was considering strategic alternatives. Thereafter, UBS conducted preliminary negotiations with 47 parties, and Ruby Tuesday entered into confidentiality agreements with 23 of those parties. All of the confidentiality agreements contained a standstill provision, prohibiting, among other things, the counterparty from acquiring shares of Ruby Tuesday and waging a proxy contest or other shareholder activism.

46. On March 23, 2017, Leon Capital Partners, LLC ("Leon"), filed a Schedule 13D with the SEC disclosing its 9% acquired interest in Ruby Tuesday since the March 13, 2017 strategic alternatives announcement, and Leon informed UBS it was interested in participating in the sale process. Thereafter, Leon entered into a confidentiality agreement with Ruby Tuesday with a standstill provision.

47. Beginning in late March 2017, UBS sent letters to 19 potential parties, requesting initial, non-binding proposals for a strategic transaction with the Company due by April 13, 2017.

48.     On April 6, 2017, Ruby Tuesday named defendant James F. Hyatt, II ("Hyatt") as President and CEO of Ruby Tuesday and appointed him to be a member of the Board.

49.     On April 13 and April 14, 2017, the Company received the following preliminary, non-binding indications of interest:

i.      Five parties (referred to in the Proxy as Bidders 1 through 5) made the following proposals to acquire the entire Company: Bidder 1 offered consideration per share of $2.40 to $2.60; Bidder 2 offered consideration per share of $3.05; Bidder 3 offered consideration per share of $3.25 to $3.40; Bidder 4 offered consideration per share of $5.75; and Bidder 5 offered consideration per share of $2.25 to $2.75;

ii.     Three parties submitted proposals to acquire Ruby Tuesday's restaurant business (including NRD and a party referred to in the Proxy as Bidder 6, which also submitted a proposal to acquire the entire company for an enterprise value of $400 to $450 million), noting that in order to consummate such an acquisition, they would expect to partner with a third party interested in entering into a sale-leaseback transaction with respect to Ruby Tuesday's real estate assets;

iii.    NRD offered to purchase Ruby Tuesday for the purchase price of $2.51 per share; and

iv.     Two parties (referred to in the Proxy as Bidders 8 and 9) submitted proposals to acquire only Ruby Tuesday's real estate assets, in the case of Bidder 8 pursuant to a sale-leaseback transaction for an enterprise value of $315 million; and in the case of Bidder 9 pursuant to a transaction structure to be determined without providing the purchase price.

50.     On April 24, 2017, Bidder 5 submitted an increased revised proposal to acquire Ruby Tuesday at *$2.75 to $3.25 per share*.

51.     In late April 2017, eight remaining bidders were provided access to the virtual data room that NRD has already been accessing.

52.     Between May 2, 2017 and May 15, 2017, Ruby Tuesday met with several of the bidders.

53.     On May 18, 2017, UBS, at the direction of the Board, sent letters to the remaining six interested parties that any second-round, non-binding proposals should be submitted to Ruby Tuesday by June 12, 2017, with a draft merger agreement.

54.     On May 26, 2017, Ruby Tuesday entered into a $20 million senior secured revolving credit facility (the "Revolving Credit Agreement") with UBS acting as the lender. The Revolving Credit Agreement required Ruby Tuesday to perform an independent review of its assets, which placed a value on its properties on an "as-dark basis" – meaning the appraised value assumed no business operations. Total value was estimated at $360 million, and this appraisal assumed no net value to the Ruby Tuesday brand, nor the Company's long-term ground leases, which in many locations appear to be below-market rates.

55.     On June 1, 2017, the Board received a letter from Engaged Capital, a 3% holder of the Company's shares, which urged the Company to conduct a "robust review" of strategic alternatives and strongly consider all acquisition offers.  Engaged Capital also requested the Board delay the deadline for stockholders to submit director nominations for the 2017 annual meeting of stockholders until after the strategic alternatives review process.

56.     On June 5, 2017, the Board responded to Engaged Capital's letter stating the Board "takes its fiduciary duties very seriously and was conducting a robust strategic review process with a view towards maximizing stockholder value." The Board also noted that no date had been set for the 2017 annual stockholders meeting yet.

57.     On June 8, 2017, NRD submitted a revised proposal and draft merger agreement with the ***purchase price of $2.77 per share*** (up from the prior offer of $2.51 per share on March 9, 2017).

58.     On June 12, 2017, Bidder 2 submitted a proposal to either purchase Ruby Tuesday as a whole based on a ***purchase price of $3.05 per share*** (valuing Ruby Tuesday at an enterprise value of $375 million), or alternatively to purchase Ruby Tuesday's 269 owned properties for $317.5 million through a hybrid sale-leaseback structure. Bidder 2 contemplated a $300 million bridge acquisition loan, but had no binding commitment yet.

59.     On June 14, 2017, Bidder 11 presented a final offer to acquire the whole company for ***$2.883 per share*** with the proposed financing comprised of $375 million from a financing source through a sale-leaseback transaction and $100 million in additional equity funding from an unspecified equity partner.

60.     On June 19, 2017, Bidder 11 revised its offer to ***$3.50 per share*** but did not deliver any committed financing.

61.     On June 21, 2017, NRD informed the Board of two options: (1) a proposal for NRD to acquire Ruby Tuesday at ***$2.55 per share*** with 15 business days for exclusivity, or (2) a proposal for NRD to acquire Ruby Tuesday at ***$2.85 per share*** with 30 business days for exclusivity.

62.     On June 27, 2017, an article from an unidentified purported shareholder of the Company was published on *Seeking Alpha* and stated, among other things, impatience with the progress of the Board's review of strategic alternatives, urged the Board to consider all the bids received, asked the Board to extend the nominating window for directors until the strategic alternatives review was completed and threatened a proxy contest if such extension request was

not honored by Ruby Tuesday.[1]

63.     On June 29, 2017, NRD submitted a revised proposal of **_$2.55 per share_**.

64.     On June 30, 2017, the Board set the date for the 2017 annual meeting of stockholders of Ruby Tuesday for December 6, 2017 and the deadline for submission of stockholder proposals as September 7, 2017.  The Board also amended and restated the bylaws of Ruby Tuesday to, among other changes, allow the Board to convene an annual meeting of stockholders at a date and time determined by the Board and clarify the Board's right to postpone, cancel or adjourn stockholder meetings.

65.     On July 12, 2017, Bidder 11 reiterated its prior proposal to acquire Ruby Tuesday at **_$3.50 per share_**, with $375 million sale-leaseback financing from a financing source subject to various conditions and $100 million equity financing from an unspecified equity partner.

66.     On July 18, 2017, Bidder 11 informed the Company that Bidder 11's financial advisor recommended a revised, lower proposal, citing the Company's unsatisfactory stock performance and financial condition.

67.     On July 19, 2017, the Board met with members of senior management and UBS and Davis Polk. The Board authorized Ruby Tuesday to proceed on two parallel paths: (i) to engage with NRD on an exclusive basis in connection with a change-of-control transaction and (ii) to continue discussions with Bidder 8 in connection with a potential standalone sale-leaseback transaction.

68.     On July 25, 2017, Ruby Tuesday received an updated offer from Bidder 11, with an offer price of **_$2.88 per share_**.

---

[1] Dr. Hugh Akston, *Ruby Tuesday Strategic Alternatives Review Process Needs Improvement*, Seeking Alpha (June 27, 2017), *available at* https://seekingalpha.com/article/4084162-ruby-tuesday-strategic-alternatives-review-process-needs-improvement.

On August 1, 2017, the Board received a Nomination Letter from a holder of 451 shares of Ruby Tuesday stock purporting to nominate a director for election at the 2017 annual stockholders meeting (the "Nomination Letter").

69. On August 12, 2017, NRD requested that Ruby Tuesday and NRD execute a no-shop agreement by the end of August 13, 2017, or NRD would terminate discussions with the Company.

70. On August 13, 2017, the Board discussed the most recent proposals from the interested parties and executed a 30-day (*i.e.*, until September 13, 2017), no-shop agreement with NRD. Notably, during the negotiations regarding the no-shop agreement, NRD assured UBS that it would not lower its offer below $2.55 per share in the future.

71. On August 14, 2017, at the direction of the Board, UBS informed Bidder 8 and Bidder 11 that Ruby Tuesday was entering into exclusive discussions with another bidder (NRD) and that it was terminating discussions with Bidder 8 and Bidder 11.

72. On August 21, 2017, Ruby Tuesday responded to the Nomination Letter explaining that the Nomination Letter did not meet the requirements for a director nomination by a stockholder under Ruby Tuesday's articles of incorporation and bylaws, and was therefore not valid and could not be submitted to Ruby Tuesday stockholders at the 2017 annual meeting of stockholders.

73. Also on August 21, 2017, the Company announced the postponement of the 2017 annual stockholders meeting to January 22, 2018, and the postponement of shareholder submissions to October 23, 2017.

74. On September 13, 2017, the 30-day no shop agreement with NRD expired. At this time, the Company did not resume or contact Bidder 2 and/or Bidder 11.

75.     On September 26, 2017, Ruby Tuesday informed NRD that it would not continue negotiating past October 12, 2017 without a fully-financed executable merger agreement.

76.     On October 9, 2017, Bidder 11 submitted an updated offer to acquire Ruby Tuesday for an offer price of *$2.88 per share*.

77.     Two days later, on October 11, 2017, NRD informed UBS it would like to reach an agreement to acquire Ruby Tuesday at $2.40 per share.

78.     Thereafter, the Board and UBS made no effort to communicate or negotiate with Bidder 11 once NRD presented Ruby Tuesday with a committed financing agreement on October 13, 2017.

79.     Ruby Tuesday entered into the Merger Agreement with NRD on October 16, 2017.

## The Company Announces the Proposed Merger

80.     On October 16, 2017, the Company issued a current report on Form 8-K with the SEC announcing the Proposed Merger:

**Ruby Tuesday To Be Acquired By NRD Capital For $2.40 Per Share**

**Maryville, TN – October 16, 2017** – Ruby Tuesday, Inc. (NYSE: RT) today announced an agreement to be acquired by a fund managed by NRD Capital ("NRD"), an Atlanta-based private equity firm that specializes in franchised and multi-location business investments.

Under the terms of the agreement, NRD will acquire all of Ruby Tuesday's common stock for $2.40 per share in cash and will assume or retire all debt obligations for a total enterprise value of approximately $335 million, excluding transaction expense. The purchase price represents a premium of approximately 37% over Ruby Tuesday's closing share price on March 13, 2017, the day before the Company announced its intention to explore strategic alternatives, and a premium of approximately 21% over Ruby Tuesday's closing share price on October 13, 2017.

"The Board of Directors and our advisors have thoroughly evaluated all options available to the Company and are confident that this agreement will provide the

most promising opportunity to realize the highest value for our stockholders while providing the best path forward for the Ruby Tuesday brand, its employees, franchisees, and loyal customers," said Stephen Sadove, Non-executive Chairman of Ruby Tuesday. "NRD Capital has a distinguished track record of achieving and maintaining profitable growth for restaurant concepts and will be an excellent partner to lead Ruby Tuesday going forward."

The transaction has been unanimously approved by Ruby Tuesday's Board of Directors and NRD and is subject to shareholder approval and other customary closing conditions. The acquisition is expected to be completed during the first calendar quarter of 2018. UBS Investment Bank is serving as financial advisor to Ruby Tuesday and provided a fairness opinion to the Ruby Tuesday Board of Directors.

"Our focus at NRD is investing in quality restaurant companies and providing strategic and operational expertise to create sustainable value. With a well-established brand, differentiated from other casual dining restaurants by its Garden Bar, we see significant opportunities to drive value for Ruby Tuesday," said Aziz Hashim, founder of NRD. "We are excited to be part of the Company's next chapter. As a private company, we will be able to take a long-term view on Ruby Tuesday, allowing us to make an investment in people, product, and customer experience, without public company constraints. This approach will enable us to reward everyone involved in our success, in addition to our investors."

Davis Polk is serving as legal advisor to Ruby Tuesday. Cheng Cohen is serving as legal advisor to NRD and Arlington Capital Advisors is serving as financial advisor to NRD

81.     The Proposed Merger has been unanimously approved by Ruby Tuesday's Board of Directors and NRD and is subject to shareholder approval and other customary closing conditions. The Proposed Merger is expected to be completed during the first calendar quarter of 2018.

82.     UBS Investment Bank is serving as financial advisor to Ruby Tuesday and provided a fairness opinion to the Ruby Tuesday Board of Directors.

83.     Davis Polk is serving as legal advisor to Ruby Tuesday. Cheng Cohen is serving as legal advisor to NRD and Arlington Capital Advisors is serving as financial advisor to NRD.

**<u>The Preclusive Deal Provisions</u>**

84. In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Ruby Tuesday.

85. Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish NRD with the terms of any competing bid and confidentiality agreement; (iii) a matching rights provision which gives NRD five (5) business days to match any unsolicited superior acquisition proposal the Board receives; and (iv) a provision that requires the Company to pay NRD a termination fee of $7.5 million, representing ***approximately 5.1% of the entire value*** of the Proposed Merger.

86. These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Ruby Tuesday.

87. Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Ruby Tuesday's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

**The Company's Officers Stand to Receive Significant
Change-in-Control Payments Not Shared by all Members of the Class**

88. The Proxy discloses that the Company's executive officers have interests in the Proposed Merger that may differ from those of the rest of the Class of Ruby Tuesday shareholders.

89.    If the Proposed Merger is consummated, certain of the Company's officers and/or directors stand to receive millions in stock options, restricted stock, service-based restricted stock units (including service-based phantom stock units) ("RSUs"), performance-based restricted stock units (including performance-based phantom stock units) ("PSUs") and phantom stock units that will vest and be converted into the right to receive either the Merger Consideration or another amount.   The treatment of these equity awards, in addition to benefits provided to executive officers through Ruby Tuesday's Change in Control Severance Plan, the 2005 Deferred Compensation Plan, and defendant Hyatt's employment agreement, will create a windfall for Ruby Tuesday's executive officers that is unavailable to the Company's other shareholders.

90.    The Proxy discloses the following chart which shows that the executive officers of Ruby Tuesday in total stand to receive up to $9.4 million, if they are let go without "cause" if the Proposed Merger is competed:

| Name | Cash ($)[1] | Equity ($)[2] | Pension/ NQDC ($) | Perquisites/ Benefits ($)[3] | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|---|
| *Named Executive Officers* | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 850,000 | 1,184,374 | 0 | 0 | 0 | 2,034,374 |
| Linda Sue Briley, Chief Financial Officer | 1,134,047 | 283,541 | 0 | 48,235 | 0 | 1,465,823 |
| Michael K. Ellis, Chief Development Officer | 1,110,714 | 273,077 | 0 | 50,946 | 0 | 1,434,737 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 1,211,557 | 307,838 | 0 | 53,448 | 0 | 1,572,843 |
| Davis W. Skena, Chief Marketing Officer | 1,177,381 | 302,978 | 0 | 52,854 | 0 | 1,533,213 |

91.    Even in the event that the Board and/or the Company's executive officers remain with the Company in the event the Proposed Merger is completed, they still stand to receive approximately $2.6 million, as shown in the chart below:

| Name | Value of Unvested Stock | Value of Vested Stock | Value of Restricted Stock | Value of RSUs ($) | Value of Phantom Stock | Value of PSUs ($) | Total ($) |
|---|---|---|---|---|---|---|---|

| | Options ($) | Options ($) | ($) | | Units ($) | | |
|---|---|---|---|---|---|---|---|
| *Named Executive Officers* | | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 0 | 0 | 1,184,374 | 0 | 0 | 0 | 1,184,374 |
| Linda Sue Briley, Chief Financial Officer | 0 | 0 | 0 | 39,259 | 157,894 | 86,388 | 283,541 |
| Michael K. Ellis, Chief Development Officer | 0 | 0 | 0 | 28,795 | 157,894 | 86,388 | 273,077 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 0 | 0 | 0 | 58,696 | 162,754 | 86,388 | 307,838 |
| Davis W. Skena, Chief Marketing Officer | 0 | 0 | 0 | 58,696 | 157,894 | 86,388 | 302,978 |

## FALSE AND MISLEADING STATEMENTS
## AND/OR MATERIAL OMISSIONS IN THE PROXY

92.     On October 31, 2017, Ruby Tuesday filed the preliminary Proxy on Form PREM 14A with the SEC in connection with the Proposed Merger (the "Proxy") containing background information and the financial analyses prepared by UBS in support of UBS's fairness opinion favoring the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material false and misleading statements or material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Ruby Tuesday's Financial Projections

93.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance

---

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at

released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

94.     In order to make the projections included on pages 53-54 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

95.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) net income; (ii) net earnings; (iii) earnings per share; (iv) interest expense; (v) depreciation and amortization; (vi) amortization of intangibles; (vii) any definition for Restaurant Level EBITDA[4]; and (viii) a reconciliation of all non-GAAP to GAAP metrics.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading and leaves Ruby Tuesday shareholders without the necessary, material information to reach a full-informed decision concerning the Company, the fairness of the Merger Consideration, and, ultimately, whether to vote in favor of the Proposed Merger.

96.     The omission of the above-referenced projections renders the financial projections included on pages 53 through 54 of the Proxy materially incomplete and misleading. If a proxy

---

http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[3] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

[4] Ruby Tuesday shareholders are unable to assess what various deductions and/or adjustments Ruby Tuesday management considered when developing this non-GAAP financial metric.

statement discloses financial projections and valuation information, such projections must be complete and accurate.

### UBS's *Discounted Cash Flow Analysis*

97.     With respect to UBS's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) Ruby Tuesday's terminal value; (ii) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 1.5% to 2.5% used for Ruby Tuesday; (iii) the inputs and assumptions underlying the calculation of the discount rate range of 9.5% to 10.5% used for Ruby Tuesday; and (iv) the reasons for selecting the approximately five-year period of October 15, 2017 through May 31, 2017 in calculating the standalone, after tax, unlevered, free cash flows that Ruby Tuesday was forecasted to generate. *See* Proxy, at 51.  These key inputs are material to Ruby Tuesday shareholders, and their omission renders the summary of UBS's *Discounted Cash Flow Analyses* materially incomplete and misleading.

### UBS's *Selected Transactions Analysis*

98.     With respect to UBS's *Selected Transactions Analysis*, the Proxy fails to disclose the individual multiples UBS calculated for each of the selected transactions, including each of the selected transaction target company's EBITDA for the prior twelve months ("LTM EBITDA"), determined from the date each selected transaction was announced.

### UBS's *Selected Public Companies Analysis*

99.     With respect to UBS's *Selected Public Companies Analysis*, the Proxy fails to disclose the individual multiples UBS calculated for each company, including each of the enterprise values of the selected companies.

100.    The omission of the above-described information from UBS's *Selected*

*Transactions Analysis* and *Selected Public Companies Analysis* renders the Proxy materially incomplete and misleading. The Company is required to disclose more than just the range that UBS applied; a fair summary of the both the *Selected Transactions Analysis* and the *Selected Public Companies Analysis* requires the disclosure of the individual multiples for each company and transaction as Ruby Tuesday shareholders are unable to assess whether UBS applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

101.    Further, the valuation analyses conducted by UBS in its fairness opinion indicate that the value of Ruby Tuesday's stock is substantially greater than represented by the Merger Consideration. UBS's *Selected Transactions Analysis* indicates a per share value range of $3.12 for the Company, which illustrates that each share of Ruby Tuesday stock has an inherent premium of approximately 130% over the $2.40 Merger Consideration. Further, UBS's *Selected Public Companies Analysis* indicates a per share value range of $2.67 for the Company, which illustrates that each share of Ruby Tuesday stock has an inherent premium of approximately 111% over the $2.40 Merger Consideration.

102.    The omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**The Flawed Sales Process**

103.    The Proxy also failed to disclose material information concerning the sales

process the Board undertook, including the following:

    a.  Whether the Board conducted an evaluation of Ruby Tuesday's real estate holdings in January 2017 and, if so, how that valuation impacted negotiations with Bidders 8 and 11, as well as NRD;

    b.  The financial projections that the Board and/or Ruby Tuesday's management provided to UBS throughout the sales process, including projections and valuations discussed at the Board meetings on January 4, 2017, February 13, 2017, March 10, 2017 and June 14, 2017;

    c.  The process UBS engaged in when selecting the 47 parties to contact concerning a possible strategic transaction involving the Company; and

    d.  Whether UBS had any prior or ongoing relationship with NRD.

104.    The above information is material and necessary in order for the Company's shareholders to make a fully informed decision on whether to vote in favor of the Proposed Merger and without such information those shareholders face irreparable harm, warranting the injunctive relief sought herein.

105.    Without this information, Ruby Tuesday shareholders were not fully informed as to the Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

## COUNT I

**(Against All Defendants for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

106.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

107.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

108.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

109.    The Defendants have issued the Proxy with the intention of soliciting stockholders support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the financial projections for the Company and the fairness opinion of Ruby Tuesday's financial advisor, UBS.

110.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

111.    The Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The

Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

112.     The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

113.     The Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

114.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

115.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act)**

116.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

117.    The Individual Defendants acted as controlling persons of Ruby Tuesday within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ruby Tuesday, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

118.    Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy  and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

120.    In addition, as set forth in the Proxy sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger

Case 3:17-cv-00494-HSM-CCS   Document 1   Filed 11/13/17   Page 27 of 29   PageID #: 27

Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

121.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

122.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

123.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing the Defendants to account to Plaintiff and the Class for all damages

sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 13, 2017                          Respectfully submitted,

s/*Paul Kent Bramlett*
PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
**BRAMLETT LAW OFFICES**
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone: 615.248.2828
Facsimile: 866.816.4116
pknashlaw@aol.com
Robert@BramlettLawOffices.com


**OF COUNSEL**

**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz
821 Franklin Ave, Suite 209
Garden City, NY 11530
Tel: (516) 493-9780
Fax: (516) 280-7376
Email: jml@jlclasslaw.com